## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

GLENN TUCKER,                )
                                     )
              Plaintiff,        )
                                     )
v.                                  )   Docket no. 2:19-cv-00213-GZS
                                   )
TOWN OF SCARBOROUGH,    )
                                   )
                                   )
              Defendant.     )

### ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Town of Scarborough's Motion for Summary Judgment (ECF No. 15).  Having reviewed the record as well as the parties' legal memoranda, the Court GRANTS IN PART and DENIES IN PART the Motion for the reasons explained below.

## I.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'" Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "A fact is 'material' if 'its existence or nonexistence has the potential to change the outcome of the suit.'" Tropigas de Puerto Rico, Inc. v. Certain Underwriters of Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Borges ex rel.

S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co., Inc. v. Robroy Inds., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also FED. R. CIV. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.").  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party."  In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II.    FACTUAL BACKGROUND

Plaintiff Glenn Tucker ("Tucker") began working as a full-time patrol officer with the Defendant Town of Scarborough ("Town") Police Department ("Department") in 2002.

(Stipulated Record (ECF No. 13), PageID # 77.)  In November 2016, Tucker was diagnosed with cirrhosis of the liver.  (PageID # 90.)  Shortly after receiving the diagnosis, Tucker spoke with a supervisor and requested time off to attend a medical appointment related to this condition.  (PageID #s 90-91.)  The supervisor advised Tucker that he did not have any earned sick time available and his request would therefore be denied.  (PageID # 91.)  Tucker contacted the Town's Director of Human Resources; she told him he had sick time available and would not be disciplined for taking the time off.  (Id.)

After Tucker attended the appointment, the Town advised him he needed to apply for intermittent medical leave under the Family and Medical Leave Act ("FMLA") for all appointments related to his ongoing treatment for cirrhosis.[1]  (PageID # 92.)  Tucker disputed the Town's assessment; however, he ultimately applied for and was granted intermittent FMLA leave at the end of November 2016.  (Id.)

Tucker did not attempt to use any FMLA leave until April 18, 2017, when he emailed a supervisor to request leave for a two-hour early departure the following day and all of Friday, April 21, 2017.  The anticipated absences were for medical appointments that had been scheduled months earlier.  (PageID #s 98, 260-61.)  Tucker's supervisor made arrangements so he could attend both appointments and informed him of this by email approximately 2.5 hours after receiving his request.  (PageID #s 260-61.)  She noted, however, that she was "very unhappy about the short notice that was given to [the Department] for these appointments" and told him that, in future, he would "need to submit time off requests in a timely matter [sic] which doesn't cause

---

[1] The parties stipulate, "Cirrhosis of the liver is a serious medical condition."   (ECF No. 16, PageID # 488; ECF No. 24, PageID # 523.)  The FMLA assures covered employees up to twelve weeks of leave per year when the employee has "a serious health condition that makes the employee unable to perform the functions of the position."  29 U.S.C. § 2612(a)(1)(D).  The FMLA provides that leave may be taken in smaller increments, known as "intermittent leave," to address a serious health condition, such as one that requires sporadic time off for ongoing treatment.  See 29 C.F.R. § 825.202.

difficulties for the schedule or other employees." (PageID # 260.) A week later, the supervisor approached Tucker, expressed concern about his health, and reiterated that he needed to provide the Department timely notice of his need for leave.[2] (PageID #s 97-98, 290.)

On April 27, 2017, Tucker met with another supervisor to discuss a request Tucker had made for leave that was related to his medical condition. (PageID #s 100-01.) During the roughly hourlong meeting, Tucker advised his supervisor that neuropathy in his legs prevented him from completing an upcoming overtime assignment that would entail over six hours of relatively stationary standing. (PageID #s 230, 262.) The supervisor reminded Tucker that if he could not cover a patrol shift, he needed to tell the Department, to ensure the shift would be filled. (PageID # 101.) Tucker asserted that he was entitled to take leave under the FMLA. (PageID # 262.) The Town's Director of Human Resources was called and placed on speakerphone; she affirmed that the Department could not deny Tucker the FMLA time he had available. The leave was eventually granted, and Tucker has not since met any resistance to his taking leave for his medical conditions.

On July 18, 2017, a drunk driver rear-ended Tucker while he was on duty. (PageID #s 193-94, 237.) He suffered a concussion and muscular injuries. (Id.) On July 27, Jane Glass, a doctor with the Town's occupational health provider, examined Tucker and cleared him to return to work on light duty. (PageID #s 116, 237, 355.) At a follow-up appointment on August 11, 2017, she added that Tucker should avoid stressful situations and computer use and recommended that he obtain medical clearance from a psychiatrist regarding his fitness for duty.[3] (PageID #s 237, 268.)

---

[2] By Tucker's account, the supervisor threatened that she would deny him time off if he again requested leave on short notice. (PageID # 98.) However, the Town asserts that the supervisor told Tucker timely notice was necessary because the Department did not want to have to deny him future leave requests due to lack of shift coverage. To the extent that these differing accounts amount to a dispute of fact, the Court does not view the dispute as material to the pending motion.

[3] Tucker contends that Glass recommended psychiatric clearance only before a return to *full* duty. The Town takes the position that Glass required medical clearance from a psychiatrist before any return to work. (Def.'s SMF (ECF No. 16), PageID # 491, DSMF 47.) The record lacks documentation or testimony from Dr. Glass, including any

Five days later, on August 16, Tucker saw his primary care physician, who determined that Tucker had no work capacity due to reported neck pain, headaches, and visual problems.  (PageID #s 237, 355.)

On August 17, the Town's workers' compensation insurer contacted Dr. Glass about Tucker's fitness for work.  A Town Human Resources Coordinator called Tucker on August 22 and told him that Glass's August 17 report stated he had no physical limitations but required a psychiatric evaluation before returning to work.  (PageID # 268.)  Tucker disputed this assessment. (PageID # 221.)  The HR Coordinator requested documentation to support Tucker's claims that he needed more time off.  Three days later, she sent Tucker a letter informing him that the Town would be designating all medical leave related to the work accident as FMLA.  (PageID # 144.) On August 29, she also provided a calculation of his remaining FMLA leave for the "rolling" twelve-month period.  (PageID # 268.)

Tucker objected to the Town retroactively counting his work accident leave as FMLA. (PageID # 272.)  The HR Coordinator's letter made him aware that some of his time off for an earlier heart surgery had been counted as FMLA leave; he objected to this as well.[4]  On August 29, the HR Coordinator emailed a response to Tucker's objections, stating, "[W]ithout the additional information from you regarding your ongoing need for treatment and additional time off, we would have [] no other choice than to require you to submit to a psychiatric evaluation." (PageID # 268.)   Tucker reiterated his objections, and, on September 1, the HR Coordinator

---

paperwork she may have completed in support of her psychiatric clearance recommendation.  Therefore, the Court notes an apparent genuine dispute of material fact as to what prerequisites Glass recommended in connection with a return to light duty.

[4] Tucker required surgery in June 2017 to treat heart disease, which the parties stipulate is "a serious medical condition."  (PageID #s 93, 96.)  Due to the surgery, he missed ten workdays, for which he was paid.  (PageID #s 93-94.)  The Town designated some of this leave as FMLA.

emailed Tucker to notify him that the Town would not designate all leave related to the work accident as FMLA, but would instead only do so from the date of her August 25 notification letter onward.  (PageID # 271.)

On October 11, 2017, Tucker's primary care physician gave Tucker a medical certification releasing him to light-duty work.[5]  (PageID # 118.)  However, the Town would not permit Tucker's return until he submitted a psychiatric report certifying he was fit for duty.  (Id.)  On November 6, Tucker provided the Town with a letter from his mental health provider.  (PageID #s 129, 239.)  About a week later, the Town's Director of Human Resources sent Tucker a proposal outlining his work restrictions, transitional work assignments in line with those restrictions, and his and the Town's respective responsibilities.  (PageID #s 119, 263-64.)  Tucker returned to light-duty work on November 14, 2017, with accommodations for his medical restrictions in place.  (PageID #s 110, 357.)  These accommodations included working four hours a day on Tucker's preferred schedule, performing office-based, administrative tasks.  (PageID #s 263-64, 266.)

By Spring 2020, Tucker worked 30 hours a week performing office-based administrative tasks for the Town.  He has been collecting workers' compensation benefits since he went on leave in July 2017 and has continuously held the position of patrol officer and received the compensation of a full-time, unrestricted patrol officer.  (PageID # 104.)  However, he has not been medically cleared to operate a vehicle in an emergency situation, which makes him unable to perform an essential function of his position.  (Id.)

Tucker takes two hours of FMLA leave per day, totaling a full twelve weeks of FMLA leave every "rolling" twelve-month period.  (PageID # 105.)  Tucker has not suffered any monetary loss due to the Town designating his medical absences as FMLA leave, but he experiences stress

---

[5] Neither that medical certification form nor any other paperwork or testimony by Tucker's primary care physician regarding Tucker's October 11, 2017 release to light duty can be found in the record.

at the prospect of running out of leave and, he fears, losing his job as a consequence.  (PageID #s 105-06.)  He has testified that he has spoken to "essentially . . . everybody" in the Department who has received workers' compensation benefits and none of them have had workers' compensation leave designated as FMLA leave.  (PageID # 103.)

Tucker has not been terminated, demoted, or disciplined since the vehicle accident. (PageID #s 105-06.)  Nor has he ever received an unfavorable performance evaluation or been denied a regular step increase in pay.[6]  (PageID # 138.)  His performance evaluations have been generally positive, with high marks for report writing, investigative procedures, and relationships with coworkers and supervisors.  (Id.)  Aside from his November 2016 leave request that was initially denied but then granted, Tucker has never been denied leave or time off to attend medical appointments associated with his medical conditions.

Nevertheless, Tucker has not been entirely satisfied with his workplace.  He alleges that, while he was on leave in September 2017, a fellow officer informed him a sergeant at the Department had told a small group of officers during Tucker's absence that Tucker suffered from PTSD and paranoia and was a danger to them.[7]  Tucker alleges the sergeant asked them to report concerns about Tucker to supervisors. (PageID #s 120.)  Tucker complained to the Town's Human Resources Director about these allegations.  (Id.)  The Town reported to Tucker on November 14, 2017, that it had investigated and was unable to substantiate his claims.  (PageID # 265.)  A sergeant testified that, although he had a conversation about PTSD with the group of officers, he never referenced Tucker or any specific individual.  (PageID #s 338-39.)

---

[6] Tucker avers that he received poor scores for use of sick time on every evaluation (ECF No. 24, PageID # 530), but these did not result in any performance evaluations that were overall unfavorable.

[7] Tucker testified that he has never been diagnosed with PTSD.  (PageID # 135.)

Tucker also alleges that supervisors in the Department attended a mandatory training regarding "either PTSD or medical privacy" at some point after he returned to work in November 2017. According to Tucker, two supervisors "loudly complained" in the hallway outside his office about having to take the class. (PageID # 112.) He perceived these comments as being directed toward him.

During his employment with the Department, Tucker received free training and certification in cellphone forensic examinations from the United States Secret Service, which provided the Department with necessary equipment as part of the program. (PageID # 84.) Cellphone forensic examinations fell within Tucker's medical restrictions and provided work for him during his first two years of licensure. (PageID #s 84, 296-97.) However, when it came time to renew Tucker's license in 2019, the cost of the associated equipment, which would now need to be borne by the Town, exceeded its value to the Department. (PageID #s 83, 297.) The Town therefore returned the equipment to the Secret Service and did not renew Tucker's license. (Id.) Tucker disagrees with this decision.

Tucker first complained to the Maine Human Rights Commission ("MHRC") about his treatment by the Town in June 2017. (ECF No. 24-1, PageID # 538.) In September 2017 he filed an administrative complaint drafted by the MHRC with both the MHRC and the United States Equal Employment Opportunity Commission alleging disability discrimination against the Town. (PageID #s 177-78.) Before the MHRC reached a decision on the complaint, Tucker requested to file his own lawsuit. (PageID # 125.) The MHRC provided Tucker a right-to-sue letter, and Tucker filed a Complaint and Demand for Jury Trial with the Maine Superior Court in late November 2018. The Town removed the matter to this Court in May 2019. (PageID #s 125, 190-201.)

### III.    DISCUSSION

In his four-count Complaint (ECF No. 3-3), Plaintiff alleges that Defendant violated his rights under state and federal medical leave laws (Counts 1 & 2) and discriminated against him on the basis of disability (Counts 3 & 4).  Defendant has moved for summary judgment on all counts. The Court begins its analysis with the medical leave claims, then turns to the disability discrimination allegations.

### A.  Medical Leave Act Violations (Counts 1 & 2)

Plaintiff alleges parallel claims under Maine's Family Medical Leave Requirements, 26 M.R.S. §§ 843-48 ("MFMLR"), and the FMLA, 29 U.S.C. §§ 2601-54.  Like the parties, the Court treats FMLA analysis as dispositive of the MFMLR claim's merits.  See Brunelle v. Cytec Plastics, Inc., 225 F. Supp. 2d 67, 76 (D. Me. 2002).

The FMLA assures every covered employee up to twelve weeks of leave per year when the employee has "a serious health condition that makes the employee unable to perform the functions of the position."  29 U.S.C. § 2612(a)(1)(D).  It prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under" the FMLA.  It also prohibits them from "discharg[ing] or in any other manner discriminat[ing] against any individual" for asserting rights under the Act. 29 U.S.C. § 2615(a).  Under the Act, employees may allege that their employer unlawfully interfered with their FMLA rights (an FMLA interference theory) or that the employer retaliated against them for asserting FMLA rights (an FMLA retaliation theory).  See e.g., Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 718-19 (1st Cir. 2014); Wysong v. Dow Chem. Co., 503 F.3d 441, 446 (6th Cir. 2007) ("There are two recovery theories available under the FMLA:  the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2).").   A plaintiff

bringing an FMLA cause of action under either theory has "the burden of proving a[] real impairment of [his] rights and resulting prejudice." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 90 (2002).  The Court understands Plaintiff to allege violations of the FMLA under both theories.

### 1.  FMLA Interference

To prevail on a theory of FMLA interference, an employee must "establish that the employer denied her benefits to which the FMLA entitled her." Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d 158, 164 (D. Mass. 2004).  Denial of these benefits includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).  See, e.g., McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 7 (D.C. Cir. 2010) ("McFadden can succeed on her claim under the FMLA without showing Ballard Spahr denied her any leave she requested; she need only show the employer interfered with the exercise of her FMLA rights." (internal citation and alterations omitted)); Kimes v. Univ. of Scranton, 126 F. Supp. 3d 477, 501-02 (M.D. Pa. 2015) (plaintiff who had never been denied FMLA leave basing an FMLA interference claim on theory that defendant's conduct "chilled her desire to take FMLA leave and made her afraid to use her FMLA leave in the future").  Plaintiff concedes that Defendant has never denied him FMLA leave to which he is entitled, but he urges that the Town has nevertheless discouraged his use of FMLA leave by designating his paid leave as FMLA[8] and making it difficult for him to obtain approval

---

[8] Specifically, Plaintiff claims that Defendant violated medical leave law by "requiring him to use his leave, and applying his leave time incorrectly" and "forc[ing him] to apply for . . . medical leave." (ECF No. 3-3, PageID #s 19-20.)  Requiring an employee to take FMLA leave may constitute FMLA interference when an employer incorrectly classifies absences that have not been taken for an FMLA qualifying reason as FMLA leave.  See Wysong, 503 F.3d at 449.  But Plaintiff does not argue that any of the contested leave was not FMLA qualifying, and he provides no theory as to why it was unlawful for Defendant to require him to apply for intermittent FMLA leave in Fall 2016.  Thus, the Court understands him only to be contesting the legality of Defendant designating paid sick leave and workers' compensation leave as FMLA.

for leave in November 2016 and April 2017.[9]  (ECF No. 3-3, PageID #s 19-20.)  Defendant argues

that its conduct did not interfere with Plaintiff's FMLA rights and, even if it did, the absence of

evidence that the alleged interference prejudiced Plaintiff dooms his claim.  The Court agrees.

Defendant did not violate the FMLA by requiring Plaintiff to use FMLA leave for paid

absences.  Employers have the right to inquire "about the reason for an employee's use of leave

. . . to ascertain whether leave is potentially FMLA-qualifying."  29 CFR § 825.301(a).  They are

also permitted to count paid leave that qualifies as FMLA leave as part of the employee's annual

FMLA leave entitlement.  See 29 CFR § 825.207 (explaining the circumstances whereby an

eligible employee may substitute accrued paid leave for FMLA leave, an "employer may require

the employee to substitute accrued paid leave for unpaid FMLA leave," or a workers'

compensation absence may be designated as FMLA leave); 29 C.F.R. § 825.301(b) (outlining

situations in which an employer could "count" paid leave "against . . . the employee's FMLA leave

entitlement"); see also Allen v. Butler Cty. Comm'rs, 331 Fed. App'x 389, 393 (6th Cir. 2009)

(stating that 29 CFR § 825.207(a) "allows employers to run paid leave and unpaid FMLA leave

concurrently").  Plaintiff does not dispute that all the leave at issue was taken due to serious health

conditions that prevented him from being able to perform the functions of a patrol officer.  He

disputes Defendant's contention that it timely notified him of his January 2017 leave's FMLA

designation, but he does not provide any evidence that his FMLA rights were impacted by this

alleged error.  See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 90-92 (2002) (explaining

that violations of FMLA procedures are only actionable if accompanied by a showing of

---

[9] He also contends that poor evaluations for use of sick time chilled his FMLA rights.  But his only evidence that he received low scores is his own testimony about the content of his performance evaluations.  This is inadmissible hearsay, see FED. R. EVID. 801-07, which cannot support a theory of FMLA interference.  See Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) ("Where, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment." (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995))).

consequential harm to an employee's FMLA rights).  As a result, the record does not create a trialworthy claim of interference.  Rather, it demands a conclusion that Defendant's designation of Plaintiff's paid time off as FMLA leave was consistent with the Act and did not interfere with Plaintiff's FMLA rights.[10]

As for the remaining conduct Plaintiff challenges as FMLA interference, the Court concludes that no reasonable juror could find it unlawfully discouraged him from exercising his FMLA rights.  For one, Plaintiff's characterization of his situation as a "scenario where the use of FMLA leave is so difficult that an[] employee must constantly argue and fight to use what is given to them by law" is not supported by the record.  (ECF No. 23, PageID # 518.)  Although Plaintiff has twice been required to call upon HR to clarify his FMLA eligibility and sick leave availability to supervisors, the supervisors' errors were promptly corrected on both occasions, and Plaintiff went on to exercise his leave rights without penalty or consequence.  Warnings from supervisors that allegedly chilled Plaintiff's exercise of FMLA rights were, at most, civil yet forceful reminders of his legal obligation to provide timely notice of foreseeable FMLA leave.[11]  See 29 C.F.R. § 825.302 (employee notice requirements for foreseeable FMLA leave).  No reasonable factfinder could conclude these interactions unlawfully interfered with Plaintiff's exercise of his FMLA rights.

---

[10] Plaintiff argues that Defendant's application of both workers' compensation coverage and FMLA leave is actionable as a "practice . . . being applied to him and no one else." (ECF No. 23, PageID # 519.)  But the gravamen of an FMLA interference claim is whether an employer interfered with an employee's FMLA rights, and Defendant did not do so when it, entirely lawfully, applied both workers' compensation coverage and FMLA leave to absences resulting from the serious health condition caused by Plaintiff's worktime accident.  Cf. Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006) ("An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.").

[11] Even crediting Tucker's version of the follow-up conversation he had with a supervisor in April, the alleged statement cannot be understood as a threat that could chill an employee's lawful exercise of FMLA rights.  The statement Tucker characterizes as a threat merely predicted a lawful consequence of any future failure to comply with FMLA notice requirements.  See 29 C.F.R. § 825.302(d) ("Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.").

Likewise, the record does not support Plaintiff's contention that he had to "constantly fight to ensure" his FMLA leave was "properly credited and used." (ECF No. 23, PageID # 518.) As already discussed, the record indicates that all leave Defendant designated as FMLA was accurately credited. To the extent Defendant did not timely notify Plaintiff that his leave had been designated FMLA, Defendant promptly rectified the error when Plaintiff brought it to Defendant's attention on August 29, 2017. The HR email rectifying the error included a calculation of Plaintiff's remaining FMLA leave, invited Plaintiff to "[p]lease let me know if this is accurate with your understanding," and stated, "I am happy to work with you further on this." (ECF No. 13-12, PageID # 271.) Nothing in the record indicates that Plaintiff ever contacted HR to dispute the accuracy of its calculation or that HR ever refused to ensure its accuracy with Plaintiff. In short, the record demonstrates that Defendant generally credited and tracked Plaintiff's FMLA leave properly, and, when it did not, it promptly corrected the error and made itself available to resolve Plaintiff's concerns. No reasonable factfinder could label this FMLA interference.

Finally, even if a factfinder could conclude that Defendant interfered with Plaintiff's FMLA rights, the absence of any evidence that such interference resulted in prejudice to Plaintiff's rights dooms his claim. Plaintiff concedes to having suffered no monetary damages and having never run out of FMLA leave due to the actions he disputes. The closest thing to prejudice he cites is "constant pressure to be at work in order to avoid running out of leave and losing his job." (ECF No. 24, PageID # 531.) But the FMLA accords covered employees a finite amount of medical leave and permits this leave to overlap with paid leave in qualifying circumstances. The stress Plaintiff experiences results from the regulatory reality that his serious health condition threatens to require more medical leave than he is entitled to under the FMLA. This is not a prejudice resulting from any deprivation of his FMLA rights; indeed, the record indicates he is exercising

those rights to their fullest extent.  On the record presented, therefore, the Court concludes Plaintiff does not have a trialworthy FMLA interference claim.

### 2.  FMLA Retaliation

An employee establishes a prima facie case of FMLA retaliation by showing "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between [her] protected conduct and the adverse employment action."  Germanowski v. Harris, 854 F.3d 68, 73 (1st Cir. 2017) (alteration in original) (internal quotations omitted) (quoting Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014)).  The parties agree that Plaintiff availed himself of FMLA leave, a right protected under the Act.  Defendant argues that Plaintiff cannot make out a prima facie case of retaliation, however, because he has not established he was adversely affected by an employment decision.  The Court agrees.  The undisputed facts establish that Plaintiff has never been denied FMLA leave; that he has not been terminated, demoted, or disciplined since exercising FMLA leave; and that he has never received an unfavorable performance evaluation or been denied a regular step increase in pay.  The Court cannot discern any arguments in Plaintiff's Opposition forwarding other retaliatory adverse action theories.  Indeed, the lack of argument as to FMLA retaliation in Plaintiff's Opposition suggests  that he has abandoned this theory.  The Court thus concludes that Plaintiff has not met his burden to state a claim for FMLA retaliation.  Defendant is entitled to summary judgment on Counts 1 & 2 of Plaintiff's Complaint.

### B.  Disability Discrimination (Counts 3 & 4)

Plaintiff alleges parallel disability discrimination claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 ("ADA"), and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-634 ("MHRA").  Because the MHRA has been construed as coextensive with the ADA,

the Court analyzes the federal and state claims simultaneously under the analytical framework for interpreting the ADA.  See Dudley v. Hannaford Bros. Co., 190 F. Supp. 2d 69, 73 (D. Me. 2002) (citing Soileau v. Guilford of Me., Inc., 928 F. Supp. 37, 45 (D. Me. 1996)).  On the summary judgment record presented, the Court construes Plaintiff's claims as pursuing two different theories: (1) that Defendant failed to reasonably accommodate his disability and (2) that Plaintiff experienced a hostile work environment due to his disability.[12]

### 1.  Failure to Accommodate

To prevail on a failure-to-accommodate theory of disability discrimination, a plaintiff must produce sufficient evidence for a reasonable juror to find that:  "(1) [plaintiff] is disabled within the meaning of the ADA, (2) [plaintiff] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [plaintiff's employer], despite knowing of [plaintiff's] disability, did not reasonably accommodate it."  Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)).  A plaintiff making a failure-to-accommodate claim has the burden of proving that she "put [her employer] on notice of her disability and need for accommodation."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260 (1st Cir. 2001).  The plaintiff also has the burden to show that her proposed accommodation was feasible for the employer under the circumstances.  Id. at 259.  The employer may rebut this showing with evidence that the proposed accommodation was not feasible.  Id.

---

[12] To the extent that Plaintiff's Complaint also could be read to state a disparate treatment claim, this theory is not developed on the summary judgment record.  Plaintiff argues that he was treated differently from co-workers without a disability in that his paid and workers' compensation leave was counted toward his FMLA allotment, but he provides no competent evidence in this regard.  Thus, he does not present a prima facie case of disparate treatment based on disability.

For purposes of summary judgment only, Defendant does not dispute that Plaintiff has had a disability as defined by the ADA since his July 2017 accident.[13]  (ECF No. 15, PageID #s 474-75.)  Instead, Defendant argues that Plaintiff cannot satisfy the third failure-to-accommodate element.  Plaintiff raises three specific instances of Defendant's failure to provide reasonable accommodations:  (1) the refusal to reinstate Plaintiff to light duty on July 27, 2017; (2) the failure to allow Plaintiff's return to work on light duty in October 2017; and (3) unsatisfactory accommodations from November 14, 2017, to the present.  As to each of these instances, Defendant maintains that the Town fully complied with the law, diligently seeking to provide, and eventually providing, reasonable accommodations for Tucker as soon as it became aware he needed them.

Before turning to analyze each of these instances in turn, the Court briefly addresses an alternative argument presented by Defendant; namely, that Plaintiff's failure-to-accommodate claim is futile as a matter of law because Plaintiff concedes he has not experienced any independent adverse employment action since his July 2017 work accident.  (ECF No. 15, PageID #477.)  Simply put, this argument misapprehends the elements of a failure-to-accommodate claim under existing First Circuit precedent.  The elements of a disability discrimination claim based on failure to accommodate are stated without reference to a requisite standalone adverse employment action.  See, e.g., Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 55 (1st Cir. 2019); Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 553 (1st Cir. 2018).  Therefore, as a matter of law, the Court concludes that Defendant is not entitled to summary judgment on Plaintiff's failure-

---

[13] Defendant's position as to whether Plaintiff was able to perform the essential functions of his job with or without reasonable accommodations is less clear.  Defendant seems to insinuate that, even with reasonable accommodations, Plaintiff cannot carry out the essential functions of his job, but it does not go so far as to argue that no reasonable juror could conclude he is unable to perform the essential functions of his job with or without reasonable accommodations. (ECF No. 15, PageID # 475.)

to-accommodate claims based on his concessions related to the lack of adverse employment actions.[14]

Having disposed of this initial argument, the Court turns to consider the various instances in which Plaintiff asserts the Town failed to provide him reasonable accommodations.

### a.  Failure to Reinstate to Light Duty:  July 27-August 16, 2017

Tucker was cleared to return to light duty by the Town's occupational health provider on July 27, 2017.[15]  However, he was effectively on paid administrative leave through August 25, 2017.  On the record presented, there is no dispute that Plaintiff received the compensation and benefits of a full-time, unrestricted patrol officer from July 27 to August 25, 2017; that Defendant did not count any of Plaintiff's leave during this period toward his FMLA allotment;[16] and that Plaintiff suffered no demotion or discipline, unfavorable performance evaluation, or denial of a regular pay increase due to effectively being placed on administrative leave.  The EEOC advises that, so long as employees are not penalized for work missed while taking leave, leave may be a

---

[14] Likewise, because an award of nominal damages is available on an ADA claim based on failure to accommodate, the Court finds no merit in Defendant's argument that Plaintiff's lack of damages warrants summary judgment on this theory of liability.  See, e.g., Orr v. City of Rogers, 232 F. Supp. 3d 1052, 1074 (W.D. Ark. 2017) (stating that, "[a]t the least, an employer who fails to accommodate an employee may be liable for nominal damages" and citing cases where such have been awarded).

[15] The Court acknowledges a genuine dispute of fact:  Plaintiff claims that Defendant refused his request to return to work on light duty after he was cleared to do so on July 27, 2017.  (ECF No. 24, PageID # 528.)  But Defendant asserts that Plaintiff did not request light-duty accommodations until October 2017.  (See ECF No. 15, PageID # 475; ECF No. 16, PageID # 486, DSMF 3; # 492, DSMF 65.)  EEOC guidance provides that an individual requesting accommodation need only inform the employer that "s/he needs an adjustment or change at work for a reason related to a medical condition."  EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA (2002), U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada (follow "Requesting Reasonable Accommodation" hyperlink).  The request Plaintiff has testified to having made thus satisfies the employer notice aspect of a failure-to-accommodate claim.  See Flaherty, 946 F.3d at 53.

[16] Tucker's personal physician determined he had no work capacity on August 16, 2017, but Tucker continued to receive all the compensation and benefits of a full-time, unrestricted patrol officer.  When Plaintiff objected to Defendant retroactively counting leave during this time toward his FMLA allotment, Defendant promptly agreed to only count leave from August 25, 2017, onward as FMLA.

form of reasonable accommodation for treatment and recuperation related to a disability.  See EEOC-CVG-2003-1, supra note 14, follow "Leave" hyperlink.  Moreover, "[a]n employer need not provide an employee's preferred accommodation as long as the employer provides an effective accommodation."  Id.  See also Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 95 (2d Cir. 2015) ("[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee.  All that is required is effectiveness." (internal citations omitted)).  Although Plaintiff may have preferred to return to work on light duty, by providing Plaintiff with what amounted to administrative leave from July 27 to August 25, Defendant provided a facially effective accommodation to Plaintiff's disability, and Plaintiff offers no evidence or argument contesting this accommodation's adequacy.  Therefore, Plaintiff cannot make a prima facie case of failure to accommodate from July 27 to August 16, 2017.

### b.  Validity of the Psychiatric Clearance requirement: October 11-November 6, 2017

Plaintiff next argues that the Town failed to accommodate his disability as of October 11, 2017, when his personal physician cleared him for light-duty work.  Plaintiff claims the Town unreasonably delayed his reinstatement until November 14, 2017.  He contends that the delay was due, at least in part, to the psychiatric clearance requirement Defendant imposed as a condition of Plaintiff's return to work.  Plaintiff ultimately attempted to satisfy this requirement by providing a letter from his mental health provider on November 6, 2017.

Significantly, Defendant does not argue that the light-duty position to which it reinstated Plaintiff on November 14, 2017, was unfeasible when Plaintiff was released to light duty in October.  Nor does it argue that the November light-duty position is not a reasonable accommodation.  On the record presented, a reasonable juror could conclude that the November light-duty position was a feasible reasonable accommodation in October.  Thus, Plaintiff satisfies

18

his burden of showing there was a feasible accommodation available to satisfy his October 2017 request.[17]  The parties agree the delay in his reinstatement derived from the psychiatric clearance requirement. So the Court next considers this psychiatric clearance requirement's validity.

Both the ADA and FMLA contain provisions regarding employer-imposed medical examinations.  The ADA prohibits employers from requiring medical examinations "unless such examination . . . is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  The FMLA permits employers to adopt "a uniformly-applied policy or practice that requires all similarly-situated employees (i.e., same occupation, same serious health condition)" to provide a fitness-for-duty certification "only with regard to the particular health condition that caused the employee's need for FMLA leave."  29 C.F.R. § 825.312(a), (b).  Where an employee with a disability also takes FMLA leave, any FMLA fitness-for-duty certification must meet the ADA's business necessity standard.  See 29 C.F.R. § 825.702(a) ("Nothing in FMLA modifies or affects any Federal or State law prohibiting discrimination on the basis of race, religion, color, national origin, sex, age, or disability.").

Defendant had a policy of requiring fitness-for-duty certifications from all employees returning from FMLA leave of more than one workweek.[18]  (See ECF No. 13-6, PageID # 257.) Plaintiff does not challenge Defendant's right to implement such a policy, but he avers that requiring psychiatric clearance here violated the FMLA because it was not "with regard" to the

---

[17] Moreover, a reasonable juror could find that his paid leave from October 11 to November 14, 2017, which, the record indicates, Defendant counted as FMLA, was not a reasonable accommodation.  Federal regulations emphasize that "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA]."  29 C.F.R. § 825.702(a) (alterations in original).  They also declare that "[a]n employer must . . . provide leave under whichever statutory provision provides the greater rights to employees."  Id. Given this guidance, an accommodation requiring Plaintiff to expend more of his FMLA leave is problematic if Plaintiff seeks another feasible accommodation that would preserve more of his FMLA leave.

[18] To the extent Plaintiff contends the fitness-for-duty certification policy was not uniformly applied in practice, the only support for this contention comes in the form of inadmissible hearsay.  As a result, the Court need not further analyze this argument.

condition that caused his FMLA leave.  (See ECF No. 23, PageID # 514.)  But it is unclear that a reasonable juror could conclude the psychiatric clearance recommendation wasn't connected to the health condition that caused Plaintiff's FMLA leave.  Plaintiff himself asserts that concussions can cause individuals to become "emotional" (ECF No. 13-2, PageID # 182) and offers nothing to refute an inference that concussion-caused head trauma could be related to psychiatric issues.  Moreover, even assuming the psychiatric clearance was not "with regard" to Plaintiff's work accident, nothing in the FMLA bars an employer from imposing medical certification requirements *beyond* the fitness-for-duty certifications explicitly permitted under the Act.  See, e.g., 29 U.S.C. § 2614(a)(4) (stating that nothing regarding fitness-for-duty certifications in the FMLA "shall supersede a valid State or local law or a collective bargaining agreement that governs" employees' return to work); Leonard v. Electro-Mech. Corp., 36 F. Supp. 3d 679, 687 (W.D. Va. 2014) (affirming employer's right to suspend an employee from work pending completion of an independent medical examination where employer received conflicting reports from employee's treating physician regarding his FMLA qualifying condition and observed ways that employee's condition might impair his ability to perform essential job functions).  Here, there is no evidence that Defendant asked Glass for anything more than her assessment of whether Plaintiff was sufficiently recovered from his work accident to be fit for duty.  She examined Plaintiff, determined he was physically fit for duty, but recommended additional psychiatric evaluation.  The FMLA does not bar a physician from offering the sort of independent recommendation Glass made, and it would be an odd rule if an employer could not act upon such a recommendation simply because it happened to arise from an examination regarding fitness for duty after FMLA leave.  Thus, the Court concludes that even if the psychiatric clearance requirement did not relate to Plaintiff's FMLA causing injuries, it was not barred by the FMLA.

The critical question remains whether it was nonetheless barred by the ADA.  The ADA "sets forth a business necessity test for a medical examination request" that is "similar, if not identical, to a justification under the general test for evaluating legitimate, non-discriminatory reasons under the McDonnell Douglas framework." López-López v. Robinson Sch., 958 F.3d 96, 105 (1st Cir. 2020).  A medical examination requirement "may be justified based on business necessity where there is a basis to believe that the employee's ability to perform her job may be impaired or the employee presents a troubling behavior that would impact the work environment." Id.  Here, it is undisputed that an examining physician recommended to Defendant that Plaintiff be psychiatrically evaluated to assess his fitness for duty.  This undoubtedly provided "a basis to believe" that Plaintiff's ability to perform his job might be impaired.  Cf. id. at 107 (stating that "no reasonable juror could find that the [employer] lacked a basis for finding that [] treatment was necessary" where the record indicated that a doctor had involuntarily admitted plaintiff for psychiatric treatment).  Moreover, courts have previously approved psychiatric fitness-for-duty certifications in contexts such as police work, where an employee's mental health, if left untended, may create a public safety hazard.  See Brownfield, v. City of Yakima, 612 F.3d 1140, 1145 (9th Cir. 2010) (recognizing that, because "[p]olice departments place armed officers in positions where they can do tremendous harm if they act irrationally," the ADA permits precautionary psychiatric fitness-for-duty examinations (alteration in original) (quoting Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999))).  On this record, requiring psychiatric clearance before a return to full duty, per Glass's August 2017 recommendation, was entirely in keeping with the business necessity standard.

However, there remains the issue of whether the psychiatric clearance applied to light duty and was a business necessity in the context of Tucker returning to light duty.  On the record

presented, the Court simply cannot resolve this issue.  Rather, the limited information available includes a factual dispute as to whether Glass recommended a psychiatric clearance only for full-duty return.[19]  Resolving that issue in favor of Plaintiff, as the Court is required to do on summary judgment, the question becomes:  Was the psychiatric clearance requirement a business necessity for Tucker's return even if not explicitly recommended by the Town's health provider and assuming Tucker would be doing only office-based administrative tasks on a part-time schedule?[20]

In the context of summary judgment, this is a trialworthy question.  In other words, a reasonable juror could conclude that Defendant's psychiatric clearance requirement was no longer a business necessity in October 2017.  To be clear, it is equally plausible that a properly instructed jury on a more fully developed factual record could conclude that the Town's request for a psychiatric clearance was job-related and consistent with business necessity.  See Brownfield, 612 F.3d at 1146 (explaining that "prophylactic psychological examinations can sometimes satisfy the business necessity standard" but also warning that the ADA "prohibits employers from using medical exams as a pretext to harass employees or to fish for nonwork-related medical issues").

Because it is undisputed that the Town deemed any psychiatric clearance requirement satisfied by Tucker providing a letter from his own mental health provider, the Court notes that this instance of potential failure to provide a feasible accommodation ended no later than November 14, 2017.

---

[19] As previously noted, the record does not include either the August 2017 document by which Glass cleared Plaintiff for duty and made a psychiatric clearance recommendation or the October 2017 report by which Tucker's personal physician released Tucker to light duty.

[20] The parties appear to agree that the October 2017 medical certification from Tucker's personal physician (not present in the record) released Tucker to light duty "with restrictions."  (ECF No. 16, PageID # 492; ECF No. 24, PageID # 528.)  It appears those restrictions included a reduced work schedule, "[n]o high speed operation of a police cruiser (driving) or routine patrol," and "[n]o physical exertion in the apprehension of a subject."  (ECF No. 13-9, PageID # 263; ECF No. 13-1, PageID # 134.)

### c.  Adequacy of Accommodation:  November 14, 2017-Present

Despite his reinstatement to light duty with accommodations on November 14, 2017, Plaintiff urges that Defendant has since (1) failed to place him in vacant positions compatible with his work restrictions and (2) refused to invest in the equipment and licensing necessary for him to continue cellphone forensic work consistent with his restrictions.  Here, as with Plaintiff's August 2017 failure-to-accommodate claim, the record demands a conclusion that Plaintiff has been provided facially effective accommodations during the challenged period.  While a plaintiff is not entitled to his preferred accommodation, he may argue that the accommodation is not, in fact, effective.  See Enica v. Principi, 544 F.3d 328, 340 (1st Cir. 2008) (plaintiff claiming her employer's apparent accommodation was inadequate).  To do so here, Plaintiff must show that he requested alternative accommodations from Defendant and that the proposed alternative accommodations were feasible.  See id. at 338, 340-43 (applying "the two-step analysis outlined in Reed" to assess a plaintiff's claim that her employer's apparent accommodation was inadequate).

He has not met this burden, however, because he has not established the feasibility of any of his suggested alternative accommodations.[21]  He vaguely alludes to positions that have become open during the pendency of this claim, but he provides no evidence of any such positions' existence beyond one about which he makes more detailed allegations.  (ECF No. 23, PageID # 515.)  With respect to that one position,[22] Plaintiff provides no evidence that he would be able to perform its functions with or without reasonable accommodations.  As for Plaintiff's claim that

---

[21] In rejecting Plaintiff's failure-to-accommodate claim with respect to November 14, 2017 forward on this ground, the Court does not address whether he has shown he requested the proposed accommodations.

[22] A "Marine Resource Officer" vacancy for which Defendant accepted applications in March 2020.  (ECF No. 23, PageID # 509.)

Defendant could have permitted him to maintain his certification in cellphone forensics, Defendant provides convincing evidence that the investment required to maintain this position would have imposed an undue hardship on Department resources, and Plaintiff offers no response.  See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260 (1st Cir. 2001) (discussing how defendants may prove undue hardship through elucidation of a proposed accommodation's costs).  No reasonable juror could find this a feasible accommodation.  Plaintiff's failure-to-accommodate claim as it pertains to November 14, 2017, onward is therefore not trialworthy.

### 2.  Hostile Work Environment

Plaintiff also claims that he was subjected to a hostile work environment as a result of his disability.[23]  To establish a hostile work environment, a plaintiff must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment."  Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 43 (1st Cir. 2011) (alterations in original) (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006)).  The severity of the allegedly hostile conduct, its frequency, and whether it unreasonably interfered with the victim's work performance are all relevant factors in distinguishing between "the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).  Courts are in agreement "that . . . 'isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment' to establish an objectively hostile or abusive work environment."  Colón-

---

[23] Plaintiff has testified that the hostile work environment extended back to 2014.  (ECF No. 13-1, PageID # 114.)  However, his argument touches only on events as early as November 2016, and the evidence of alleged harassment or hostility before November 2016 is scant and underdeveloped such that no reasonable jury could conclude it amounted to actionable conduct.  Thus, since neither the record nor filings put any conduct before November 2016 in issue, the Court does not address the parties' arguments regarding the statutory limitations period for Plaintiff's disability discrimination claims.

Fontánez, 660 F.3d at 44 (internal quotations omitted) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Plaintiff points to the following in support of his hostile work environment claim: (1) November 2016 interactions with a supervisor regarding a request for medical leave; (2) April 2017 interactions with supervisors regarding his use of and requests for FMLA leave; (3) a supervisor's alleged discussion with other officers about Plaintiff's medical condition in Fall 2017 and Defendant's allegedly delayed investigation into the incident; (4) two supervisors' allegedly Plaintiff-directed expressions of displeasure with being required to attend a training "for either PTSD or medical privacy" in 2018 (ECF No. 13, PageID # 112); and (5) termination of his assignment in digital forensic examinations (ECF No. 23, PageID # 517). Construed in the light most favorable to Plaintiff, these do not amount to an objectively hostile or abusive work environment. First, as discussed with respect to Plaintiff's FMLA interference claim, no reasonable juror could conclude that Plaintiff's 2016 and 2017 interactions with supervisors regarding medical leave went beyond civil communication and dialogue. Second, the alleged discussion about Plaintiff's medical condition and pointed comments about a required training are, at most, the sort of "ordinary slings and arrows that workers routinely encounter in a hard, cold world"—insufficient for establishing an objectively hostile and abusive work environment. Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000); see Colón-Fontánez, 660 F.3d at 45 (stating that evidence of co-workers telling plaintiff to get on social security or apply for disability, calling her a hypochondriac, claiming she was "faking it," or generally isolating her from general workplace interactions was insufficient to establish hostile work environment). Third, Plaintiff's lower scores for attendance, which never resulted in a negative performance evaluation, can hardly be characterized as unreasonably interfering with his work performance. And fourth, Defendant

has provided convincing evidence that it terminated Plaintiff's cellphone forensics work for entirely nondiscriminatory business reasons, and Plaintiff has provided nothing to refute this. Taken together, these alleged acts of harassment do not amount to a trialworthy hostile work environment claim.

### B.  CONCLUSION

Accordingly, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (ECF No. 15).  The Court DENIES summary judgment as to Count 3 and 4 to the extent these claims assert that Defendant failed to provide reasonable accommodations to Plaintiff between October 11, 2017 and November 14, 2017.  The Court GRANTS summary judgment as to all other theories and claims.

In light of this ruling, this case shall be placed on the Court's next available civil trial list and any pretrial motions shall, to the extent practicable, be filed before the final pretrial conference.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 17th day of June, 2020.